UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

CHRISTINE LACY,

      Plaintiff,

              **MEMORANDUM & ORDER**

    v.          11-CV-4600 (MKB)

MICHAEL J. ASTRUE, Commissioner of
Social Security,

      Defendant.

--------------------------------------------------------------x

MARGO K. BRODIE, United States District Judge:

  Plaintiff Christine Lacy filed the above-captioned action seeking review pursuant to 42

U.S.C. § 405(g) of a final decision of Defendant Commissioner of Social Security denying her

application for disability insurance benefits.  Defendant moves for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the Commissioner's

decision is supported by substantial evidence and should be affirmed.  Plaintiff cross-moves for

judgment on the pleadings, arguing that the Administrative Law Judge ("ALJ") failed to follow

the treating physician rule, the ALJ inadequately considered other medical evidence, and that the

Appeals Council did not give proper consideration to new and material evidence.  The Court

heard argument on December 18, 2012.  For the reasons set forth below, the Defendant's motion

for judgment on the pleadings is granted, and Plaintiff's motion is denied.

## I. Background

  Plaintiff was born in 1965 and graduated high school in 1983.  (R. at 26, 29, 101.)

Plaintiff is married and lives with her husband and three of her children.  (*Id*. at 31.)  From

January 1993 through January 2009, she worked as a school bus matron, which involved driving

a bus four hours a day and helping to load wheelchairs into buses.  (*Id*. at 27–29, 102.)  From January 2003 through December 2008, Plaintiff also worked as a boat detailer, washing and waxing boats. [1]  (*Id*. at 29–30.)  Plaintiff filed for disability insurance benefits on June 7, 2010, claiming that she became eligible on October 26, 2008.  (*Id.* at 41, 85–86, 101.)  Plaintiff claimed that she stopped working due to her asthma and bronchitis.  (*Id.* at 101.)  Although she only listed asthma and bronchitis on her initial application, Plaintiff also claims to suffer from knee, neck, and back pain, as well as reduced movement in her left shoulder.  (*Id*. at 29, 33, 221, 226–248; Pl. Mem 3.)  Plaintiff's application for disability benefits was denied, and she requested a hearing before an Administrative Law Judge ("ALJ").  (R. at 52–53.)  Plaintiff was assigned an attorney, and a hearing was held on May 4, 2011.  (*Id.* at 26–40, 42.)  At the hearing, Plaintiff and Vocational Expert Leopold testified.[2]  (*Id*. at 26–40.)  The ALJ issued a decision on May 27, 2011, finding that Plaintiff was not disabled.  (*Id*. at 12–20.)  Plaintiff appealed the ALJ's decision to the Appeals Council.  (*Id*. at 7–8.)   The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (*Id*. at 1–6.)

### a.  Plaintiff's Medical Background

#### i.  Plaintiff's Testimony

At the ALJ hearing, Plaintiff testified that she has a severe case of bronchial asthma and experiences back pain.  (R. at 29.)  She has been hospitalized for her asthma, which she states

---

[1] Plaintiff states that she stopped working as a school bus matron in January 2009 and that she stopped working as a boat detailer in December 2008.  (R. 102; Pl. Mem. 2.)  Plaintiff also states that she stopped working entirely on October 26, 2008 and claims disability benefits starting on that date.  (R. at 85–86, 97; Pl. Mem. 3.)  Although there are discrepancies in the record regarding when Plaintiff stopped working, the ALJ found that Plaintiff stopped working on October 26, 2008.  (R. at 14.)

[2] The Record does not indicate the full name of the Vocational Expert.

feels "like trying to get a breath of air and [she] can't." (*Id.* at 30.) Plaintiff takes medications daily for her asthma, including Symbicort and a Proventil nebulizer. (*Id.* at 30.) She takes her nebulizer four times a day. (*Id.*) Plaintiff is only supposed to take her inhaler every 4 to 6 hours, but she claims that she takes it every ten minutes because she "can't breathe." (*Id.* at 30.) Plaintiff stated that her inhaler does not provide much relief from the wheezing, and her wheezing returns about ten minutes after she takes her medication. (*Id.* at 36.) She has never smoked cigarettes. (*Id.* at 30.) Plaintiff also has knee problems. (*Id*. at 33.) She testified that her knee hurts "bad[ly]" and that she suffers from regular spasms. (*Id.*) Plaintiff testified that she went to a doctor who prescribed massage and weight resistance therapy and that she has not had surgery. (*Id.* at 33–34.)

Plaintiff also testified that she is forced to take breaks throughout the day due to her asthma and back problems. (*Id.* at 36.) For example, Plaintiff sometimes shops and helps clean her house, but she becomes out of breath after approximately 10 to 15 minutes when she is shopping. (*Id.* at 31–32, 35.) Plaintiff does not do the laundry or drive a car, and she has trouble sleeping because of her breathing problems. (*Id.* at 31–33.) Plaintiff testified that she can only sit for about ten minutes at a time before she has to stand up, although she did not specify why. (*Id.* at 34.) She also cannot walk farther than half a block, which takes her approximately ten minutes. (*Id.* at 34.) Plaintiff testified that she can lift a gallon of milk, but she cannot carry groceries from her car to her house. (*Id.* at 34–35.) She does not believe that she could work in an office, sitting down for six hours a day and standing for two hours a day, because of her neck. (*Id.* at 36.)

### ii.  Treatment Records

#### 1.  Asthma

Plaintiff visited the Shellabarger Health Center on multiple occasions between December 2008 and May 2010.  (R. at 132–52.)  Plaintiff primarily saw Dr. Edmee Henriquez.  On December 4, 2008, Plaintiff was seen by Dr. Henriquez for follow-up after she was treated for bronchitis.  (*Id*. at 151–52.)  At that time, she was not in acute distress and an examination only revealed rhonchi — snore-like sounds — and mild wheezing.  (*Id*. at 152.)  Plaintiff's oxygen saturation was 96 percent.[3]  (*Id*.)  Dr. Henriquez noted that Plaintiff was taking Albuterol, Advair, Singulair, Nasonex, and Xonpenex.  (*Id*.)  Dr. Henriquez ordered chest x-rays and blood tests.  (*Id*.)  Plaintiff's chest x-rays showed that her lungs were clear with no evidence of active chest disease.  (*Id*. at 171.)  Plaintiff also underwent a pulmonary function test.  (*Id*. at 165–66.)  The test initially revealed moderate obstruction, but when the test was repeated 10 minutes later, the results were normal.  (*Id*.)

In January 2009, Plaintiff was treated in the emergency department of the Shellabarger Health Center and placed on an antibiotic, an oral steroid, Naprosyn, and a cough suppressant.  (*Id*. at 150.)  A chest x-ray was taken and returned normal.  (*Id*.)  Plaintiff saw Dr. Henriquez again on February 2, 2009.  (*Id*. at 149–50.)  Plaintiff continued to complain of a productive cough, and her lungs showed wheezing with decreased air entry.  (*Id*.)  Oxygen saturation was 99 percent.  (*Id*.)  Dr. Henriquez noted that Plaintiff was taking an Albuterol inhaler, Advair, and Singulair, and that her asthma was exacerbated.  (*Id*.)  Plaintiff returned on February 11, 2009 for

---

[3]  According to the Mayo Clinic, normal levels of oxygen saturation are 95 to 100 percent, under most circumstances.  *Hypoxemia (low blood oxygen)*, MAYO CLINIC (Jan. 4, 2013), http://www.mayoclinic.com/health/hypoxemia/MY00219.

a follow-up visit. (*Id*. at 147–48.) Plaintiff needed a refill of her Albuterol prescription and had mild expiratory wheezing. (*Id*. at 148.) Her oxygen saturation level was 80 percent. (*Id*.)

Plaintiff failed to show up for her next appointment, scheduled for February 18, 2009. (*Id*. at 147.) She saw Dr. Henriquez on February 23, 2009. (*Id*. at 146–47.) She again failed to show for her appointments on March 16 and March 30, 2009 and next saw Dr. Henriquez on April 1, 2009. (*Id*. at 144–45.) On February 23 and April 1, Dr. Henriquez noted Plaintiff had inflamed or enlarged turbinates, which can result in a blockage in the nasal passage, but her lungs were clear. (*Id*. at 144–47.)

On April 7, 2009, Plaintiff began treatment for persistent, severe asthma with Dr. Paul Bohensky, a pulmonologist. (*Id*. at 179–81, 198.) Dr. Bohensky noted that Plaintiff has chronic allergies and has had asthma since childhood. (*Id*. at 180.) Plaintiff told Dr. Bohensky that she had daily asthmatic reactions and severe attacks approximately once a month. (*Id*.) Dr. Bohensky observed that Plaintiff was not in acute distress but that she was positive for a number of symptoms, including chest tightness, shortness of breath, wheezing, exercise limitations, and chronic productive cough. (*Id*. at 180.) He noted breath sounds were generally normal throughout, but she had mild wheezing. (*Id*. at 179.) He diagnosed her as having bronchial asthma, which was inadequately controlled, and ordered pulmonary function testing. (*Id*.) He adjusted Plaintiff's medications to include a course of Prednisone, and he advised her to use an Albuterol nebulizer regularly. (*Id*.) Dr. Bohensky stated that the April 27, 2009 pulmonary function tests revealed mild chronic obstructive pulmonary disease, some difficulty in breathing, and restrictive lung disease effecting Plaintiff's ability to exhale and expel air. (*Id*. at 186.) Dr. Bohensky's treatment notes during the period from April to December 2009 show that Plaintiff complained of, among other things, shortness of breath, wheezing, heaviness and tightness, and nasal congestion. (*Id*. at 174–78.)

5

Plaintiff returned to Dr. Henriquez on May 13, 2009.  (*Id*. at 141–42.)  Her lungs were

clear and her oxygen saturation was 99 percent.  (*Id*. at 141.)  Dr. Henriquez found, among other

things, that Plaintiff's asthma was stable and well-controlled.  (*Id*. at 142–43.)  Plaintiff

scheduled an appointment with Dr. Henriquez for June 18, 2009 but did not show up for the

appointment.  (*Id*. at 140.)

On August 17, 2009, Plaintiff saw Dr. Henriquez and complained of nausea and mild

abdominal pain.  (*Id*. at 140.)  Dr. Henriquez ordered an abdominal ultrasound and noted that

Plaintiff had scattered wheezing in her lungs.  (*Id*.)  Plaintiff again did not appear for her

appointment on August 24, 2009 but returned to Dr. Henriquez on August 28, 2009.  (*Id*. at 139.)

The abdominal ultrasound results were normal.  (*Id*. at 170–71.)  Plaintiff stated that her nausea

had improved.  (*Id*. at 139.)  Dr. Henriquez noted that Plaintiff's lungs were clear and she had

full motor strength.  (*Id*.)  His assessment was that Plaintiff suffered from nausea, back pain, and

hypertension but that her asthma had improved.  (*Id*.)  On September 3, 2009, Plaintiff saw Dr.

Bohensky, complaining of shortness of breath, increased wheezing, and increased heaviness and

tightness.  (*Id*. at 176.)  Plaintiff requested a note from Dr. Bohensky stating that she could not

work, but Dr. Bohensky denied that request.  (*Id.*)

After missing three scheduled appointments with Dr. Henriquez on September 4, October

18, and October 21, 2009, Plaintiff was hospitalized at Brookhaven Memorial Hospital Center

from November 30 through December 5, 2009 for exacerbation of asthma.  (*Id*. at 138, 188–92.)

A chest x-ray taken on December 1, 2009 revealed a collapsed lung.  (*Id*. at 169; 191.)  Plaintiff

was treated for asthma with Solu-Medrol, Singulair, Proventil, Azithromycin, and Zithromax.

(*Id*. at 191.)  Her shortness of breath subsided and her cough improved.  (*Id*. at 191.)  The

discharge diagnosis was exacerbation of asthma, hypertension, and pneumonia.  (*Id*. at 192.)

Upon discharge, Plaintiff was instructed to taper her dose of Predinisone over twelve days, use

6

her albuterol inhaler as needed, continue on antibiotics for three days, and keep her scheduled appointment with Dr. Bohensky on December 11, 2009.  (*Id*. at 191.)

On January 28, 2010, Plaintiff returned to Shellabarger Health Center and saw a new physician.  (*Id*. at 135–36.)  She was wheezing, but her oxygen saturation was 96 to 98 percent.  (*Id*.)  The doctor discussed the issue of Plaintiff's lack of compliance with medications and appointments.  (*Id*. at 136.)  Despite being counseled regarding keeping her appointments, Plaintiff did not attend her follow-up appointment scheduled for February 1, 2010.  (*Id*.)  She returned on March 10, 2010 and saw a different doctor.  (*Id*.)  Examination revealed wheezing and moderate air entry, and oxygen saturation was 99 percent.  (*Id*. at 134.)  This doctor also discussed with Plaintiff her failure to comply with treatment.  (*Id*.)

On May 7, 2010, Plaintiff saw Dr. Henriquez, and his examination revealed wheezing.  (*Id*. at 132.)  Plaintiff's oxygen saturation level was 100 percent.  (*Id*.)  Plaintiff complained of pain and swelling in her lower left leg, and a test was ordered to rule out blood cuts.  (*Id*.)  The test returned normal.  (*Id*. at 167.)

### 2. Knee, Spine, and Shoulder

On February 8, 2009, Plaintiff was involved in a motor vehicle accident.  (*Id*. at 224.)  At her February 11, 2009 visit to the Shellabarger Health Center, Plaintiff complained of back pain.  (*Id*. at 148.)  On February 16, 2009, Plaintiff saw a chiropractor, Pavlos Passas, complaining of headaches and pain in her neck, thoracic spine, and lumbar spine.  (*Id*. at 224.)  On March 25, 2009, Passas referred Plaintiff for nerve conduction testing and an electromyogram ("EMG").  (*Id*. at 224–25.)  Plaintiff underwent EMG and nerve conduction testing on March 26, 2009.  (*Id*. at 226–32.)  The EMG study revealed evidence of left sided C6 radiculopathy, a condition in which one or more nerves are affected and which can cause pain in various parts of the body.  (*Id*.)

7

On February 24, 2009, Plaintiff saw Karlyn Nafey, a physicians' assistant, and Dr. Samir Haddad at Long Island Neurological, P.C., for an initial consultation following her February 8 motor vehicle accident.  (*Id*. at 233–36.)  Plaintiff complained of neck and lower back pain, and physical and neurological exams were conducted.  (*Id*. at 233–34.)  Plaintiff had tenderness, muscle spasm, and reduced range of motion in her cervical and lumbar spine, reduced reflexes in her legs, decreased sensation to light touch in her cervical spine, and slight decreased muscular strength in her right leg.  (*Id*. at 234.)  Plaintiff was advised to have a magnetic resonance imaging ("MRI") scan conducted of her cervical and lumbosacral spine and nerve conduction studies of her arm.  (*Id*.)  She was instructed to take pain medication, continue chiropractic treatment, and return to Dr. Haddad for follow-up in a couple of weeks.  (*Id*.)  An MRI of Plaintiff's cervical spine on March 27, 2009 revealed mild bulging disks but was otherwise normal.  (*Id*. at 237, 248.)  An MRI of Plaintiff's lumbosacral spine on the same day revealed no abnormalities.  (*Id*. at 238, 249.)  On April 7, 2009, Plaintiff returned to Dr. Haddad, whose findings were generally the same as in his previous examination.  (*Id*. 235–36.)  He administered injections, recommended Plaintiff continue with physical therapy, and prescribed pain and anti-inflammatory medications.  (*Id*. at 236.)

Dr. Ira Chernoff, an orthopedic spinal surgeon, evaluated Plaintiff on May 6, 2009.  (*Id*. at 237–38, 240.)  He found that Plaintiff had normal reflexes, normal sensation, normal power in her legs and arms, decreased range of motion of her left shoulder, and tenderness in the acromioclavicular ("AC") joint, which is located at the top of the shoulder.  (*Id*. at 238–40.)  Dr. Chernoff reviewed Plaintiff's x-rays and MRIs and found that Plaintiff's cervical spine MRI showed some minor disc bulging.  (*Id*.)  He gave her cortisone injections and advised her to ice her shoulder and return in six weeks.  (*Id*. at 240.)

Pavlos Passas referred Plaintiff to Dr. David Dynof for an orthopedic examination.  (*Id*.
at 249.)  Dr. Dynof evaluated Plaintiff on June 9 and June 21, 2009.  (*Id*. at 239–47.)  Plaintiff
complained of neck and back pain following her February car accident.  (*Id*.)  She stated that her
symptoms had gotten worse since her accident and her pain was "exacerbated with sitting, lying
down and prolonged standing and is worse during the morning."  (*Id*. at 239.)  Dr. Dynof
reviewed Plaintiff's x-rays and MRI reports and noted that Plaintiff had tenderness, muscle
spasms, and reduced range of motion in her cervical spine, paravertebral muscle tenderness in
her thoracic spine, and tenderness and muscle spasm in her lumbosacral spine.  (*Id*. at 239–47)
Plaintiff improved between examinations.  (*Id*.)  Dr. Dynof advised Plaintiff to continue with
chiropractic care and pain medication and recommended physical therapy for Plaintiff's left
shoulder.  (*Id*. at 244, 247.)

On October 8, 2010, Plaintiff saw Dr. Gus Katsigiorgis of Island Musculoskeletal Care
for complaints of knee pain.  (*Id.* at 219.)  X-rays of Plaintiff's knees revealed no fractures.  (*Id.*
at 220.)  Dr. Katsigiorgis diagnosed Plaintiff with a bilateral knee sprain or strain and ruled out
any tear.  (*Id.* at 219.)  He recommended physical therapy.  (*Id.*)  Plaintiff returned on October
14, 2010 for a follow-up visit.  (*Id.* at 221.)  Examination of her knees revealed mild tenderness
in the right knee and mildly restricted range of motion.  (*Id.*)  On February 10, 2011, Dr.
Katsigiorgis administered a cortisone injection to Plaintiff's left knee and recommended physical
therapy and a home exercise program.  (*Id.* at 222.)

### iii.  Medical Evaluations/Opinions

#### 1.  Dr. Bohensky (pulmonologist)

On January 10, 2010, Dr. Bohensky wrote a letter to the New York State Office of
Disability Assistance.  (R. at 198.)  He stated that Plaintiff had been under his care since April 7,
2009 for severe asthma, and that she was seen approximately once every six to ten weeks to help

9

control her asthma.  (*Id*. at 197–98.)  He stated that Plaintiff took numerous medications for asthma, but, "[d]espite this aggressive treatment, Mrs. Lacy has frequent exacerbations of her asthma predominantly as a result of exposure to noxious fumes at work, but also [as a] result of other triggers.  These exacerbations require[] adjustment of her medications with the addition of steroids and antibiotics."  (*Id*. at 198.)  He advised that "[a]s a result of her severe asthma, Mrs. Lacy is completely disabled at this time."  (*Id.*)

### 2.   Residual Functional Capacity Assessment

The Residual Functional Capacity ("RFC") assessment, which is based on all of the evidence in Plaintiff's file, diagnosed Plaintiff with asthma, hypertension, obesity, and chronic allergies.  (*Id.* at 199–200.)  The RFC assessment found that Plaintiff was able to lift twenty pounds occasionally and ten pounds frequently, stand two hours a day, sit six hours a day, and do an unlimited amount of pushing and pulling in an eight hour workday.  (*Id.* at 199–200.)  The RFC assessment noted that Plaintiff needs to avoid moderate exposure to fumes, odors, dusts, gases, and poor ventilation and avoid concentrated exposure to extreme cold and humidity.  (*Id.* at 202.)  The RFC assessment found that Plaintiff can have unlimited exposure to wetness, noise, vibration, and hazards.  (*Id.* at 202.)  The RFC assessment concluded that, based on the medical evidence in Plaintiff's file, Plaintiff's claim that she is unable to perform the work activities of a bus matron and boat detailer appear to be credible.  (*Id.* at 203.)

### 3.   Dr. Joseph Gallo (consulting internist)

On August 4, 2010, Dr. Joseph Gallo conducted an examination of Plaintiff on behalf of the Social Security Administration.  (R. at 207.)  Dr. Gallo noted that Plaintiff has bronchial asthma with shortness of breath, which causes lightheadedness and difficulty in walking, and that she continually has frequent asthma attacks.  (*Id*.)  According to his report, Plaintiff needs to use her inhaler and nebulizer daily.  (*Id*.)  Dr. Gallo also noted that Plaintiff was recently diagnosed

with gout and complains of swelling in her left leg.  (*Id.*)  At the time of the examination,

Plaintiff appeared "to be in moderate respiratory distress" and was "clinically wheezing."  (*Id.* at

208.)  She was not using oxygen or any assistive device.  (*Id.*)  Plaintiff's stance was normal, and

she could walk on her heels and toes without difficulty and perform a complete squat.  (*Id.*)  She

did not need assistance changing for the examination or getting on and off the examination table.

(*Id.*)  She was able to rise from the chair without difficulty.  (*Id.*)

Dr. Gallo examined Plaintiff's breathing and noted wheezing but no other abnormal

sounds.  (*Id.* at 209.)  There was no significant chest wall abnormality.  (*Id.*)  Plaintiff had full

range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles, and her joints

were stable and not tender.  (*Id.* at 209.)  Her neurological exam appeared normal.  (*Id.*)  An

examination of Plaintiff's extremities revealed no swelling of the joints of the foot, knee, or

elbow.  (*Id.*)  Dr. Gallo also conducted pulmonary function testing.  (*Id.*)  The testing revealed

that before medication, Plaintiff showed mild restriction, but after medication, Plaintiff showed

significant improvement.  (*Id.*)  He diagnosed Plaintiff with severe bronchial asthma and found

that her prognosis was fair.  (*Id.* at 209–10.)  He stated that Plaintiff has no limitations in sitting,

standing, bending, kneeling, or reaching, and moderate limitations in walking, climbing stairs,

lifting, and carrying.  (*Id.*)  He stated that Plaintiff was suffering from shortness of breath and she

needs to avoid dust, smoke, pollen, or other respiratory irritants due to her bronchial asthma.

(*Id.*)

### b.  Testimony of Vocational Expert

At the hearing, Plaintiff testified regarding her work as a school bus matron and boat

detailer.  Using the Department of Labor's Dictionary of Occupational Titles, Leopold, a

Vocational Expert, classified Plaintiff's past positions.  Leopald categorized Plaintiff's school

bus matron position as that of a school bus monitor, which is light and unskilled, and wheelchair

aide, which is medium and unskilled.  (*Id.* at 37.)  Leopald found that Plaintiff's work as a boat detailer was analogous to that of an automobile detailer, which is a medium and unskilled position.  (*Id.* at 37.)

Leopald testified that if Plaintiff had the residual functional capacity to perform medium work of an unskilled nature, she would be able to perform either of her past jobs.  (*Id.* at 38.) She also testified that, if Plaintiff was limited to a job that did not expose her to irritants, she would not be able to perform either of her past positions.  (*Id.* at 38.)  Leopald advised that there was work in the tri-state region for someone of Plaintiff's age, education, and experience, who could perform light, unskilled labor so long as they were not exposed to irritants.  (*Id.* at 38.) She listed two examples of light, unskilled positions:  cashier and indoor messenger.  (*Id.* at 38.) Leopald stated that there were 70,000 regional and 3 million national cashier positions and 20,000 regional and 200,000 national indoor messenger positions.  (*Id.*)  Leopald also testified that if Plaintiff is unable to walk more than half a block, is frequently out of breath, and needs to use her nebulizer four times a day, Leopald does not "believe [Plaintiff] would be able to sustain any employment."  (*Id.* at 39.)

### c.  The ALJ's Decision

The ALJ conducted the five-step sequential analysis, discussed in more detail below. First, the ALJ found that Plaintiff had not engaged in substantial activity since October 26, 2008. (R. at 14.)  Second, the ALJ found that Plaintiff had the following severe impairments:  bronchial asthma, obesity, and bilateral knee injuries.  (*Id.*)  The ALJ determined that these impairments "cause more than a minimal limitation in basic work activity."  (*Id.*)  The ALJ also determined that, although Plaintiff alleged disability due to back impairments as well, her "cervical and lumbar spine derangements do not cause more than minimal limitations in basic work activity." (*Id.*)  Third, the ALJ found that Plaintiff did not have an impairment that is listed in Appendix 1

of the regulations.  (*Id*.)  The ALJ considered listings in sections 3.00, which addresses the respiratory system, 4.00, which addresses the cardiovascular system, and 1.00, which addresses the musculoskeletal system, and determined that the severity of Plaintiff's impairments did not rise to the level of these listings.  (*Id.*)

Fourth, the ALJ found that Plaintiff "has the residual functional capacity to perform the full range of light work" and that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (*Id* at 14.)  However, he determined that "the claimant' statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (*Id.*)  The ALJ found that the medical evidence demonstrates that Plaintiff has a history of chronic obstructive pulmonary disease or bronchial asthma since childhood and that Plaintiff's symptoms were triggered by exposure to noxious fumes at work and other respiratory irritants.  (*Id*.)  Plaintiff has allergic rhinitis and sinusitis that contributes to her respiratory problems, and chest x-rays showed a collapsed lung but no lung disease.  (*Id*.)  Plaintiff has asthma attacks and complains of wheezing, productive cough, and shortness of breath.  (*Id*.)  The ALJ reviewed Plaintiff's treatment records and stated that Plaintiff's physical examinations revealed wheezing and other abnormal breathing sounds and her pulmonary function tests showed mild pulmonary disease.  (*Id*. 15–16.)  He acknowledged Plaintiff's asthma-related hospitalization but noted that she has never required incubation or treatment with oxygen.  (*Id*. at 15–17.)  The ALJ concluded that "although the claimant's asthma results in some limitation of activities of daily living, it is not so severe as to preclude all work activity."  (*Id.* at 16.)  He found it significant that Plaintiff "has had this condition since childhood and managed to work for many years in spite of her symptoms and functional limitations."  (*Id.*)

13

The ALJ also reviewed the medical evidence regarding Plaintiff's knee impairment, including the evidence from Dr. Katsigiorgis.  (*Id*. at 17–18.)  The ALJ stated that Plaintiff complained of pain, clicking, and popping of the knees and that physical examination revealed, among other things, tenderness and a restricted range of motion.  (*Id*. at 18.)  Plaintiff's knee x-rays were negative for fractures, and she was diagnosed with a bilateral knee sprain or strain. (*Id*.)  The ALJ stated that Dr. Katsigiorgis prescribed physical therapy and a home exercise program and advised the claimant to restrict activities."  (*Id*.)

The ALJ reviewed all of the medical evidence and concluded that, although "a State Agency single decision maker opinion is not an acceptable medical source and is hardly dispositive," the RFC assessment was persuasive because it was "supported by the preponderance of the medical record and the claimant's testimony."  (*Id*. at 18.)  He found, after reviewing the entire record, that Plaintiff "retains the residual functional capacity to perform light work, which entails sitting six hours, standing/walking two hours and lifting/carrying twenty pounds in an eight-hour workday, with no exposure to respiratory irritants."  (*Id*. at 18.) He concluded, however, that Plaintiff is unable to perform any past relevant work, since her school bus matron and wheelchair aide position required carrying 50 pounds in an eight hour workday and her position as a boat detailer required exposure to noxious fumes.  (*Id.*)

Fifth, the ALJ reviewed the Vocational Expert's testimony and, based on a residual functional capacity for the full range of light work and considering Plaintiff's age, education, and transferable work skills, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, and therefore she was "not disabled."  (R. at 18– 20.)

14

### d. New Evidence

On May 5, 2011, one day after Plaintiff's hearing, Dr. Bohensky completed a "Pulmonary Residual Functional Capacity Questionnaire" regarding Plaintiff's condition. (R at 251–54.) There is no indication in the record that Plaintiff submitted this questionnaire to the ALJ, even though it was completed the day after her hearing. Instead, Plaintiff waited and submitted the questionnaire to the Appeals Council as part of her request for review. In the questionnaire, Dr. Bohensky stated that Plaintiff has severe asthma, which is characterized by shortness of breath, chest tightness, wheezing, rhonchi, episodic acute asthma, episodic acute bronchitis, fatigue, and coughing. (*Id.* at 251.) Dr. Bohensky explained that as a result of upper respiratory infections, allergens, irritants, cold air, or a change in the weather, Plaintiff suffers asthma attacks every one to two months, which require steroids and hospitalization and leave her incapacitated for an average of two to five weeks. (*Id.* at 251.) He advised that Plaintiff can tolerate moderate work stress but noted stressors for Plaintiff are environmental as well as emotional. (*Id.* at 252.)

In response to a question regarding how often Plaintiff's pain or other symptoms were severe enough to interfere with the "attention and concentration needed to perform even simple tasks," Dr. Bohensky noted that Plaintiff is "not working." (*Id.*) He indicated that Plaintiff can walk only one-half of a city block without rest or severe pain. (Id.) When asked how long Plaintiff can sit or stand at one time, Dr. Bohensky indicated that Plaintiff can sit for less than an hour and stand for one-half hour and noted that she is "disabled." (*Id.* at 252–53.) He checked "less than 2 hours" regarding a question about how long Plaintiff can sit in an eight hour work day. (*Id.*) He did not indicate how long Plaintiff could stand in an eight hour work day. (*Id.*) In response to a question regarding whether Plaintiff would sometimes need to take unscheduled breaks during an eight hour workday, Dr. Bohensky checked "yes" and, instead of answering the

15

follow-up questions regarding how often this would happen or how long Plaintiff would need to rest, he noted Plaintiff "is disabled" and "unable to work." (*Id*.) Regarding physical functions, Dr. Bohensky indicated that Plaintiff can "rarely" or "occasionally" lift less than ten pounds and "never" more than that. (*Id*. at 253.) He also indicated that Plaintiff could "occasionally" twist, "rarely" stoop, bend, crouch, or squat, and "never" climb ladders or stairs. (*Id*.) He advised that Plaintiff must avoid all exposure to extreme cold, high humidity, wetness, cigarette smoke, soldering fluxes, solvents/cleaners, fumes/odors/gases, dust, and avoid even moderate exposure to extreme heat and perfumes. (*Id.* at 253–54.) Dr. Bohensky concluded that Plaintiff is disabled and unable to work. (*Id.* at 252, 253, 254.)

## II.    Discussion

### a.    Standard of Review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also Selian v. Astrue*, No. 12-871, 2013 WL 627702, at *6 (2d Cir. Feb. 21, 2013). Substantial evidence requires "more than a mere scintilla." *Selian*, 2013 WL 627702, at *6 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quoting *Richardson*, 402 U.S. at 401). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder *would have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citations and internal quotations omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier*

16

*v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations and internal quotations omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner.  *McCall v. Astrue*, No. 05 Civ. 2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'"  *McCall*, 2008 WL 5378121, at *8 (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b.   Availability of Benefits

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Social Security Act (the "Act").  To be eligible for disability benefits under the Act, the plaintiff must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Commissioner has promulgated a five-step analysis for evaluating disability claims.  20 C.F.R. § 404.1520.  The Second Circuit has described the steps as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider him [*per*

17

*se*] disabled. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian*, 2013 WL 627702, at *7 (quoting *Talavera v. Astrue*, 697 F.3d 154, 151 (2d Cir. 2012));

*see* 20 C.F.R. § 404.1520.  Although the plaintiff bears the burden of proof at the first four steps

of the evaluation, the ALJ has an affirmative "duty to investigate the facts and develop the

arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 111 (2000).  This

duty exists "regardless of whether the Plaintiff is represented by counsel."  *Contreras v. Astrue*,

No. 11 Civ. 1179, 2012 WL 2399543, at *2 (S.D.N.Y. June 26, 2012) (quoting *Shaw v. Chater*,

221 F.3d 126, 131 (2d Cir. 2000)).

### c.  Analysis

Defendant now moves for judgment on the pleadings, arguing that the Commissioner's

decision is supported by substantial evidence in the record.  (Def. Mem. 1.)  Plaintiff cross-

moves for judgment on the pleadings, arguing that reversal is proper based on the following legal

errors:  (1) the ALJ failed to follow the treating physician rule; (2) the ALJ inadequately

considered other medical evidence; and (3) the Appeals Council improperly denied review of

new evidence submitted with the request to review the ALJ's decision.  (Pl. Mem. 15–21.)

### i.  Treating Physician Rule

Plaintiff argues that the ALJ erred in failing to give sufficient weight to the analysis of

Dr. Bohensky and Dr. Katsigiorgis, Plaintiff's treating physicians.  (Pl. Mem. 16–17.)  "A

treating physician's statement that the claimant is disabled cannot itself be determinative."

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Snell v. Apfel*, 177 F.3d

128, 133 (2d Cir. 1999)).  But a treating physician's opinion on the "nature and severity" of the

plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."  20 C.F.R. § 404.1527(c)(2); *see Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." (internal citations omitted)); *see also Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983))).  "The report of a consultative physician may constitute such substantial evidence."  *Petrie*, 412 F. App'x at 405 (citing *Mongeur*, 722 F.2d at 1039).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Specifically, the ALJ must consider:  "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion."  *Id*.  The regulations require that the ALJ set forth the reasons for the weight he or she assigns to the treating physician's opinion. *Halloran*, 362 F.3d at 32.

### 1.  Dr. Bohensky's Opinion

Although the ALJ did not specifically state that he was giving "controlling weight" to Dr. Bohensky's opinions, his decision demonstrates that he did.  *See Sessions v. Astrue*, No. 08 Civ.

724, 2010 WL 883697, at *5 n.2 (W.D.N.Y. Mar. 8, 2010) (finding that the ALJ did accord controlling weight to treating physician's assessment where, even though ALJ did not specifically state he was giving "controlling weight," the ALJ fully incorporated the physician's opinions into his decision); *see also Roma v. Astrue*, 468 F. App'x 16, 19–20 (2d Cir. 2012) (holding that the treating physician rule was appropriately applied even though "the ALJ did not specifically state that he was according 'controlling weight'" to a treating physician's opinion because the ALJ accepted the "vast majority" of the physician's conclusions and, "to the extent the ALJ discounted [the physician's] opinion, if at all, his decision to do so was supported by other substantial record evidence").

     The ALJ reviewed Dr. Bohensky's treatment records and fully incorporated Dr. Bohensky's opinions regarding Plaintiff's diagnoses and physical impairments into his decision. (R. at 16–17.)  He noted that Dr. Bohensky began treating the claimant on April 7, 2009 upon referral from her primary care physician for persistent, severe asthma, and that Plaintiff was seen every six to ten weeks in order to control her asthma.  (*Id*.)  Plaintiff had frequent asthmatic reactions occurring on a daily basis and severe attacks at least once a month that lasted seven to ten days and were caused by multiple factors.  (*Id*. at 16.)  The ALJ stated that Plaintiff suffers from nasal congestion, a nonproductive cough, wheezing, and shortness of breath, and accepted Dr. Bohensky's diagnosis that Plaintiff suffers from bronchial asthma.  (*Id*. at 17.)  He referenced the pulmonary function testing ordered by Dr. Bohensky that showed Plaintiff had mild chronic obstructive pulmonary disease.  (*Id*.)  The ALJ noted that the severity of Plaintiff's symptoms varied, and that at times she had increased allergy symptoms, asthma attacks, and productive coughing.  (*Id*.)  Dr. Bohensky placed Plaintiff on an aggressive treatment regimen; however, she still had frequent asthma attacks, predominately as a result of exposure to noxious fumes at work, but also due to other triggers.  (*Id*.)  The ALJ stated that these attacks required Dr.

Bohensky to adjust Plaintiff's medications.  (*Id*.)  The ALJ incorporated Dr. Bohensky's records,

diagnoses, and opinions into his opinion, and they informed his conclusion that Plaintiff was

only able to perform light work with no exposure to respiratory irritants.  (*Id*. at 18.)

The only aspect of Dr. Bohensky's opinions that the ALJ did not completely adopt is Dr.

Bohensky's statement in his July 10, 2010 letter that "claimant is completely disabled at this

time."  (*Id*. at 17, 198.)  Although the ALJ considered this statement, he ultimately concluded

that Plaintiff is not disabled, as she is capable of light, unskilled work.  (*Id*. at 18–20.)  Although

the ALJ is required, absent a specific finding, to give controlling weight to a treating physician's

opinion, that obligation does not extend to the ultimate disability determination.  *See Miller v.*

*Astrue*, 538 F. Supp. 2d 641, 650 (S.D.N.Y. 2008) ("[A] treating physician's opinion on whether

plaintiff is disabled or unable to work is not binding, and the ALJ must review underlying

medical findings and other objective evidence to support such a conclusion.").  To the contrary,

the determination of whether a claimant is disabled is reserved for the Commissioner.  *Snell*, 177

F.3d at 133 (2d Cir. 1999) ("Moreover, some kinds of findings — including the ultimate finding

of whether a claimant is disabled and cannot work — are 'reserved to the Commissioner.'  That

means that the Social Security Administration considers the data that physicians provide but

draws its own conclusions as to whether those data indicate disability.  A treating physician's

statement that the claimant is disabled cannot itself be determinative." (internal citation

omitted)); *see also Micheli v. Astrue*, No. 11 Civ. 4756, 2012 WL 5259138, at *2 (2d Cir. Oct.

25, 2012) (quoting *Snell*, 177 F.3d at 133).

The ALJ was under no obligation to give controlling weight to Dr. Bohensky's claim that

Plaintiff is completely disabled "at this time" due to severe asthma.  (R. at 198.)  Dr. Bohensky

did not provide any explanation for his conclusion.  He simply stated that, despite Plaintiff's

aggressive asthma treatment plan, she has "frequent exacerbations of her asthma predominantly

as a result of exposure to noxious fumes at work, but also the result of other triggers."[4]  (*Id.* at 198.)  Less than one year prior, yet still within the time period Plaintiff alleges she was disabled, Dr. Bohensky denied Plaintiff's request for a note stating that she could not work.  (*Id.* at 19.)  Although Plaintiff stated at oral argument that this apparent discrepancy reflected Dr. Bohensky's evolving assessment of Plaintiff, there is no indication in Dr. Bohensky's records why he suddenly found her to be "completely disabled."  (Tr. 10:9–17.)  Moreover, although the ALJ did not accept Dr. Bohensky's disability determination, the symptoms described elsewhere in Dr. Bohensky's records — e.g. coughing, shortness of breath, wheezing, chest soreness, nasal congestion, and fatigue — are entirely consistent with the ALJ's finding that Plaintiff could perform light, unskilled, work as long as she was not exposed to respiratory irritants.  (R. 14, 18, 251–54.).  The ALJ was not bound by Dr. Bohensky's conclusion that Plaintiff is disabled.  The Court finds that the ALJ gave controlling weight to Dr. Bohensky's clinical findings.

## 2.  Dr. Katsigiorgis's Opinion

Plaintiff also claims that the ALJ did not consider Dr. Katsigiorgis's findings regarding her bilateral knee problems "appropriately" when determining that Plaintiff was capable of the full range of light work.  (Pl. Mem. 17.)  Plaintiff does not specifically argue that the treating physician rule should be applied to Dr. Katsigiorgis's findings.  Instead, she simply maintains that the ALJ "made a determination that the plaintiff could perform a full range of light work

---

[4] Plaintiff argues that the ALJ did not give sufficient weight to Dr. Bohensky's statement that her asthma was exacerbated, not only by exposure to noxious fumes at work, but also "as a result of other triggers."  (Pl. Mem. 17.)  The ALJ specifically noted Dr. Bohensky's entire statement, including the fact that her asthma was exacerbated by "other triggers," in his decision.  Although the ALJ did not specifically say so, it appears he took this into account in concluding that Plaintiff could only perform light work "with no exposure to respiratory irritants," as he concluded that Plaintiff must avoid all respiratory irritants, not just the noxious fumes she faced as a boat detailer.  (R. at 18.)

without thoroughly evaluating the effects of the Plaintiff's bilateral knee condition, and accompanying symptoms, on her ability to work." (*Id.*)

A treating source is defined as a plaintiff's own "physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502. Doctors who see a patient only once or twice do not "have a chance to develop an ongoing relationship with the patient, and therefore are not generally considered treating physicians." *Shatraw v. Astrue*, No. 04 Civ. 0510, 2008 WL 4517811, at *10 (N.D.N.Y. Sept. 30, 2008). A doctor who has treated and evaluated the patient only a few times may be considered a treating source if "the nature and frequency of the treatment or evaluation" is typical of a patient's condition. 20 C.F.R. § 404.1502. Dr. Katsigiorgis treated Plaintiff for knee pain and examined her three times between October 7, 2009 and February 10, 2010. (R. a 219–23.) Assuming, without deciding, that this amounts to an "ongoing relationship" sufficient to invoke the treating physician rule, the Court finds that the ALJ gave controlling weight to Dr. Katsigiorgis's opinions.

The ALJ specifically considered Dr. Katsigiorgis's records. He noted that Dr. Katsigiorgis's records demonstrate "clinical evidence of mild tenderness along the joint line with mild restricted range of motion," contain no report of swelling or effusion, state no history of trauma or injury, and conclude that x-rays showed bilateral knee sprain/strain but no evidence of fractures or tears. (*Id*. at 17.) He referenced Dr. Katsigiorgis's diagnosis of bilateral knee strain or sprain and prescription of physical therapy, home exercise, and cortisone injections. (*Id*. at 18.) The ALJ incorporated Dr. Katsigiorgis's opinions into his decision, and they informed his conclusion that Plaintiff was unable to perform her previous jobs. (*Id*.) Therefore, the Court

finds Plaintiff's argument that the ALJ did not properly consider Dr. Katsigiorgis's treatment records to be without merit.

### ii.  ALJ's Treatment of Other Medical Evidence

Plaintiff also argues that the ALJ did not adequately consider the records of Dr. Haddad, Dr. Chernoff and Dr. Dynoff in determining that Plaintiff's "cervical and lumbar spine derangements do not cause more than minimal limitations in work activity" and in failing to address Plaintiff's left shoulder pain.  (Pl. Mem. at 18; R. at 14.)  Dr. Haddad, Dr. Chernoff, and Dr. Dynoff examined Plaintiff following her car accident on February 8, 2009.  Plaintiff does not specifically argue that the treating physician rule should apply to these records.  (Pl. Mem. 18.)  The Court finds that the treating physician rule does not apply.

The record indicates that Plaintiff only saw Dr. Haddad twice, on February 24, 2009 and April 7, 2009 (R. at 233–36); Dr. Chernoff once, on May 6, 2009 (*Id*. at 237–238, 240); and Dr. Dynoff twice, on June 9, 2009 and July 21, 2009, (*Id*. at 239, 241–247).  As discussed above, a doctor who has only seen a patient once or twice is not considered a treating physician.  *See Petrie*, 412 F. App'x at 405 (2d Cir. 2011) ("[A] physician who only examined a claimant 'once or twice' did not see that claimant regularly and did not develop a physician/patient relationship with the claimant," and therefore "such a physician's opinion [is] not entitled to the extra weight of that of a treating physician." (internal quotation marks omitted)); *Lasitter v. Astrue*, No. 12 Civ. 112, 2013 WL 364513, at *6 (D. Vt. Jan. 30, 2013) (finding a doctor who only treated the plaintiff on one or two occasions "did not have an ongoing treatment relationship with her and was not a 'treating physician' for purposes of the treating physician rule").  Since Dr. Haddad, Dr. Chernoff, and Dr. Dynoff each only saw Plaintiff once or twice following her car accident, the Court finds that they were not "treating physicians" for the purpose of the treating physician rule.

24

In any event, the ALJ's findings were consistent with the medical records of Dr. Haddad, Dr. Chernoff, and Dr. Dynoff.  The ALJ did not dispute that Plaintiff has "cervical and spine derangements."  (R. at 14.)  Instead, he found that Plaintiff's "cervical and spine derangements" did not "cause more than minimal limitations in basic work activity" and therefore did not qualify as severe impairments.  (*Id*. at 14.)  A severe impairment "significantly limits [one's] physical or mental ability to do basic work activities."  20 CFR § 404.1520(c).  Sixteen days after her accident, Plaintiff was diagnosed as having severe cervical and lumbar derangements.  (*Id*. at 234.)  However, subsequent records indicated improvement.  MRIs conducted on March 27, 2009 indicated that Plaintiff had mild bulging disks in her cervical spine and that her lumbar spine was normal.  (*Id*. at 248–49.)  Documents from July 21, 2009, Plaintiff's last orthopedic follow-up appointment in the record, show that although Plaintiff still experienced lower back pain, she was experiencing some relief from injections and chiropractic treatment.  (*Id*. at 245.)  Dr. Dynof found that, although there still was "moderate tenderness" along Plaintiff's cervical and lumbar spines, the tenderness and muscle spasm along Plaintiff's lumbar spine had decreased since her last examination.  (*Id*. at 246.)  Dr. Dynof recommended that Plaintiff continue with chiropractic care and "once again stressed the importance of a home exercise program to maintain range of motion and improve overall function."  (*Id*. at 247.)  There is no evidence in the record that Plaintiff sought medical treatment for her cervical and lumbar derangements after July 21, 2009.  Furthermore, Dr. Gallo examined Plaintiff over a year later and found that she had full range of motion of her neck, shoulders, cervical spine, and lumbar spine.  (*Id*. at 209.)  These records support the ALJ's initial determination that only Plaintiff's asthma and knee pain amounted to severe impairments and his ultimate conclusion that Plaintiff could perform light work.  The Court finds that the ALJ adequately considered Plaintiff's spinal derangements.  Plaintiff's claims to the contrary are without merit.

Plaintiff also complains that the ALJ did not specifically address her shoulder pain.  (Pl. Mem. 18.)  Dr. Haddad diagnosed Plaintiff with a "left shoulder derangement" on April 7, 2009, (R. at 236), and on May 6, 2009, Dr. Chernoff gave her cortisone injections, (*Id.* at 240). Subsequent records showed improvement.  On June 9, 2009, Dr. Dynoff noted that although Plaintiff's left shoulder was tender and she had a decreased range of motion, there was no apparent swelling, the rotator cuff appeared to be intact, and muscle strength was normal.  (*Id.* at 242–44.)  On July 21, 2009, Dr. Dynoff found that while Plaintiff's left shoulder was still tender, her range of motion had improved.  (*Id.* at 246.)  On August 13, 2009, an MRI was conducted of Plaintiff's left shoulder and returned normal, with "[n]o internal derangement identified."  (R. at 250.)  There is no evidence in the record that Plaintiff sought medical treatment for her shoulder pain after July 21, 2009, and, over a year later, Dr. Gallo found that Plaintiff had full range of motion in her shoulders.  (*Id.* at 209.)  Thus, Plaintiff's records demonstrate that the pain in her left shoulder improved.  Moreover, Plaintiff did not mention her shoulder pain during Dr. Gallo's examination, in her Representative Brief submitted prior to the ALJ hearing, or during her testimony at the ALJ hearing.  (*Id.* at 24–40, 117–18, 207–17.)  The Court finds that the ALJ did not err in not specifically mentioning her left shoulder in his decision.

### iii.   Appeals Council's Denial of Review of New Evidence

Plaintiff contends that the Appeals Council improperly denied her request for review based on the new evidence that she submitted following the ALJ's decision.  This evidence consisted of a Pulmonary Residual Functional Capacity Questionnaire from Dr. Bohensky, dated May 5, 2011.  (R. at 7–8, 251.)  The Appeals Council stated that it had considered the additional evidence but "found that this information does not provide a basis for changing the Administrative Law Judge's decision."  (*Id.* at 2.)

26

The Appeals Council must consider evidence proffered by a claimant that is both new and material.  20 C.F.R. § 404.970(b); *see Knight v. Astrue*, No. 10 Civ. 5301, 2011 WL 4073603, at *12 (E.D.N.Y. Sept. 13, 2011) (citing *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)).  The Second Circuit has defined "new evidence" as evidence that has not been considered previously and is "not merely cumulative of what is already in the record."  *Knight*, 2011 WL 4073603, at *12.  "Material evidence" refers to evidence that "is both relevant to the claimant's condition during the time period for which benefits were denied and probative."  *Id*. Materiality requires "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently."  *Shields v. Astrue*, No. 11 Civ. 2088, 2012 WL 1865505, at *2 (E.D.N.Y. May 22, 2012) (quoting *Jones*, 949 F.2d at 60); *see* 20 C.F.R. § 404.970(b) ("If new and material evidence is submitted, the Appeals Council . . . shall evaluate the entire record including the new and material evidence submitted . . . .  It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.").

There is no "reasonable possibility" that this new evidence would have caused the ALJ to decide the issue of Plaintiff's disability differently.  The ALJ was aware that Plaintiff suffers from severe asthma and acute shortness of breath, requiring steroids and hospitalization, and has been prescribed various medications.  (R. at 15–18, 251.)  The ALJ took into consideration Dr. Bohensky's diagnosis of Plaintiff and his treatment records.  However, the ALJ did not adopt Dr. Bohensky's conclusion that Plaintiff is "disabled."  The only additional information included in the questionnaire that was not in prior submissions by Dr. Bohensky is his assessment of Plaintiff's residual functional capacity.  Dr. Bohensky maintains that Plaintiff can only walk about half a block without rest or severe pain, can sit less than one hour at a time, can stand up to one-half hour at a time, and can sit less than two hours during an eight hour workday.  Regarding

her physical functions, Dr. Bohensky indicated that Plaintiff can "rarely" or "occasionally" lift

less than ten pounds, and she can "occasionally" twist, "rarely" stoop, bend, crouch, or squat,

and "never" climb ladders or stairs.  (*Id*. at 252–53.)  The questionnaire does not include any

relevant treatment notes, reports, or laboratory or test results that had not been previously

provided to the Social Security Administration.  (*Id*. at 251–54.)

       "It is firmly established and set forth in the regulations that the determination of the

[residual functional capacity] is an issue reserved for the Commissioner."  *Ward v. Comm'r of

Soc. Sec.*, No. 06 Civ. 673, 2009 WL 1754376, at \*5 (N.D.N.Y. June 19, 2009); *see* 20 C.F.R.

§§ 404.1527(d)(2) and 416.927(d)(2) ("Although we consider opinions from medical sources on

issues such as . . . your residual functional capacity . . . the final responsibility for deciding these

issues is reserved to the Commissioner."); *see also Rice v. Barnhart*, 127 F. App'x 524, 526 (2d

Cir. 2005) ("[W]hile an ALJ must consider the data provided by a physician as to the nature and

severity of an applicant's impairments, the legal determination of an applicant's residual

functional capacity is reserved to the Commissioner.").  Therefore, to the extent Dr. Bohensky's

"opinions infringe upon this reserved issue, they are not properly considered medical opinions

entitled to deference."  *Buchanan v. Comm'r of Soc. Sec.*, No. 08 Civ. 0854, 2009 WL 1743933,

at \*8 (N.D.N.Y. June 18, 2009).

       The information the questionnaire provides, namely, a restrictive assessment of Plaintiff's

functional abilities and a judgment that Plaintiff is disabled and unable to work, is repetitive of

information that the ALJ had before him and carefully considered.  Dr. Bohensky had previously

offered his opinion that Plaintiff was "completely disabled," and the ALJ concluded otherwise.

(*Id*. at 2–3.)  Although this new questionnaire provides more details regarding Dr. Bohensky's

assessment of Plaintiff's functional abilities, the ALJ already reviewed Dr. Bohensky's treatment

records and took Dr. Bohensky's restrictive assessment into account.  The questionnaire provides

no new diagnostic information and does not appear to be based on any new examinations, reports, or tests. *C.f. Montaldo v. Astrue*, No. 10 Civ. 6163, 2012 WL 893186, at *15 (S.D.N.Y. Mar. 15, 2012) (holding that the ALJ properly declined to give controlling weight to questionnaire because, among other reasons, questionnaire conflicted with treating physician's own findings and findings of another doctor); *Edwards v. Barnhart*, No. 06 Civ. 402, 2007 WL 708802, at *10 (D. Conn. Mar. 6, 2007) (finding questionnaires are "not the type of 'medical opinion' that the ALJ must consider giving controlling weight," and that, "even assuming that the questionnaires should have been considered a medical opinion," the ALJ properly declined to give controlling weight to questionnaires that were inconsistent with other substantial evidence in the record).

There is no reasonable possibility that this information would have changed the ALJ's opinion. *See Bittles v. Astrue*, 777 F. Supp. 2d 663, 668 (S.D.N.Y. 2011) (holding that a questionnaire "submitted after the ALJ rendered decision, indicat[ing] that [Plaintiff] was unable to perform any form of work during the Applicable Period," was not sufficient to change the ALJ's decision, where the "medical records relied on by the ALJ provided more than a 'mere scintilla' of evidence on which to make the Decision"); *see also* 3 Soc. Sec. Law & Prac. § 43:19 ("A report regarding a claimant's residual functional capacity which consists merely of a form in which a physician is required only to check a box or fill in a blank, although admissible in an administrative proceeding, is generally entitled to little weight in the evaluation of a claimant's allegedly disabling impairment. When reports of this nature are unaccompanied by thorough written reports and fail to offer, for example, an analysis of a claimant's significant, nonexertional limitations, their reliability is suspect." (internal citations omitted)). The Court finds that, even considering the new medical opinion evidence offered by Plaintiff, there is substantial evidence to support the ALJ's decision that Plaintiff was not disabled because, at the

time of the ALJ's decision, Plaintiff was capable of performing a significant number of jobs in the national economy that are defined as unskilled labor requiring light exertion.  *See Toribio v. Barnhart*, No. 02 Civ. 4929, 2003 WL 21415329, at *2 (S.D.N.Y. June 18, 2003) ("[T]he court reviews the entire administrative record, including the new evidence, to determine whether there is substantial evidence to support the Commissioner's final decision.").  The Court agrees with the Appeals Council's finding that the questionnaire was not sufficient to change the ALJ's decision.

**III.    Conclusion**

For the forgoing reasons, the Court finds that there is substantial evidence in the record to support the ALJ's decision, and the Defendant's motion for judgment on the pleadings is granted.  Plaintiff's cross-motion for judgment on the pleadings is denied.  The Clerk of Court is directed to enter judgment in favor of Defendant and to close the case.

SO ORDERED:


_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  March 15, 2013
         Brooklyn, New York

30